**ORDERED PUBLISHED**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP Nos.  AZ-11-1105-JuKiCl |
| ) | AZ-11-1149-JuKiCl |
| GREGORY A. FRIEDMAN and ) | (Consolidated) |
| JUDITH MERCER-FRIEDMAN, ) | |
| ) | Bk. No.  07-02135 |
| Debtors. ) | |
| _____) | |
| ) | |
| GREGORY A. FRIEDMAN; JUDITH ) | |
| MERCER-FRIEDMAN, ) | |
| ) | |
| Appellants, ) | |
| v. ) | **O P I N I O N** |
| ) | |
| P+P, LLC, ) | |
| ) | |
| Appellee. ) | |
| _____) | |

Argued and Submitted on January 18, 2012
at Phoenix, Arizona

Filed - March 19, 2012

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Philip H. Brandt, Bankruptcy Judge, Presiding
Honorable James M. Marlar, Chief Bankruptcy Judge, Presiding[*]

_____

Appearances:     Scott D. Gibson, Esq., of Gibson, Nakamura &
                 Green, PLLC, argued for appellants Gregory A.
                 Friedman and Judith Mercer-Friedman;
                 Daniel Mark Press, Esq., argued for National
                 Association of Consumer Bankruptcy Attorneys, as
                 amicus curiae, by special leave of the Panel,
                 supporting the appellants' position.

_____

[*] Judge Brandt issued the order denying confirmation of the plan, BAP No. 11-1105.  Judge Marlar issued the order converting the case to chapter 7, BAP No. 11-1149.

Before: JURY, KIRSCHER, and CLARKSON,[**] Bankruptcy Judges.

CLARKSON, Bankruptcy Judge:

Chapter 11 debtors, Gregory Friedman ("Gregory") and Judith Mercer-Friedman ("Judith") (collectively, the "Friedmans" or "Debtors"), appeal the bankruptcy court's orders denying confirmation of their second amended plan (BAP No. 11-1105) and converting their case to chapter 7 (BAP No. 11-1149).

These consolidated appeals raise the issue whether the absolute priority rule embodied in § 1129(b)(2)(B)(ii)[1] applies to individual chapter 11 debtors. We granted leave to the National Association of Consumer Bankruptcy Attorneys ("NACBA") to file an amicus brief in support of Debtors' position that the rule does not apply to them. Both the Appellants and the NACBA participated in the oral arguments before us. No party has participated as an appellee in this appeal. For the reasons stated, we hold that the absolute priority rule does not apply in individual debtor chapter 11 cases and REVERSE the bankruptcy court's order denying confirmation of their second amended plan (BAP No. 11-1105). We also REVERSE the bankruptcy court's order converting the Debtors' chapter 11 case to chapter 7 (BAP No. 11-1149). We REMAND these matters to the bankruptcy court for

---

[**] Hon. Scott C. Clarkson, Bankruptcy Judge for the Central District of California, sitting by designation.

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

further action consistent with this opinion.

## I. FACTS[2]

The Friedmans are technology entrepreneurs who founded and operated several internet-related businesses. Several of those businesses suffered financial difficulties and had filed for protection under chapter 11 of the United States Bankruptcy Code. Eventually, however, those businesses were unable to reorganize and their bankruptcy cases were dismissed, leaving the Friedmans with significant tax liabilities and unpaid secured and unsecured business debts.

### A. The Prior Corporations' Bankruptcy Events

The Friedmans founded Netbeam, Inc. ("Netbeam"), a company that provided high speed wireless internet services to customers in Summit County, Colorado. On July 10, 2001, Netbeam filed a voluntary petition for chapter 11 relief in the Colorado bankruptcy court (Bankruptcy Case No. 01-19986). Two days prior to Netbeam's filing, the Friedmans formed Peak Speed Communications, Inc. ("Peak"). Ten days after Netbeam's filing, the Friedmans, as officers of Peak, entered into an Operating and Merger Agreement between Netbeam and Peak. Although this

---

[2] Debtors' record on appeal is far from complete. In their brief, they cite to docket numbers of pleadings filed in the bankruptcy court, but do not provide us with citations to any particular page number or lines in the pleadings in violation of Rule 8010(a)(1)(D). As a result, we were left to search the pleadings cited for the relevant facts and procedural background of this case. We take judicial notice of the relevant pleadings which were docketed and imaged in Debtors' underlying bankruptcy case as well as those filed in Debtors' business bankruptcy cases in the District of Colorado (Bankruptcy Nos. 01-19986 and 04-19246). Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

agreement was not disclosed to the bankruptcy court, the Friedmans implemented its terms. At some point, the undisclosed agreement surfaced and an examiner was appointed.

Netbeam eventually confirmed a plan which effectively merged Netbeam and Peak. In accordance with the confirmed plan, Peak, the successor, closed a loan from First United Bank (the "Bank") in the approximate amount of $600,000. P+P, LLC ("P+P") pledged $200,000 to guarantee the loan. The loan was secured by all of Peak's assets and a second deed of trust on the Friedman's real property located in Breckenridge, Colorado ("the Breckenridge Property"), which they used as a rental property and a part-time residence.

During Netbeam's bankruptcy, significant amounts of employment taxes went unpaid. Eventually, Netbeam ceased making its quarterly payments to the U.S. Trustee and was unable to make other payments required under the plan. On August 22, 2006, the bankruptcy court dismissed Netbeam's case.

A few years earlier, on May 3, 2004, Peak filed a chapter 11 petition in the Colorado bankruptcy court (Bankruptcy Case No. 04-19246). During the course of Peak's bankruptcy, P+P purchased the Bank's loan to Peak. In the process, P+P stepped into the Bank's shoes with respect to the Bank's security interest in virtually all of Peak's assets and the second deed of trust on the Breckenridge Property. P+P then acquired and later sold Peak's assets.

In 2007, P+P commenced an action in the Colorado state court against the Friedmans, seeking a declaration that it had a valid lien on the Breckenridge Property and the right to

foreclose. The state court entered a default judgment in favor of P+P which began foreclosure proceedings on the Breckenridge Property.

### B. The Friedmans' Bankruptcy Events

On October 27, 2007, the Friedmans filed their chapter 11 petition in the Arizona bankruptcy court, thus staying the foreclosure.[3] Their Schedule A valued the Breckenridge Property at $750,000 and Schedule D showed the property was overencumbered with three liens. Washington Mutual Home Loans ("Washington Mutual") had a first lien in the amount of $578,000. P+P had a second lien in the amount of $556,000. Finally, a painting company held a third lien in the amount of $2,500.

Debtors' Amended Schedule B showed personal property consisting of household goods and vehicles. It also showed that Debtors (1) were the sole members in AZCI NET, LLC ("AZCI"), a wireless internet service provider located in Arizona City, Arizona; (2) owned 100% of the stock of Blue River Networks, Inc. ("Blue River"), a technology and management consulting and support company located in Arizona City, Arizona; (3) were partners in a family trust named JGF Family LLP, the purposes of which were resort rental management services and family trust; and (4) held stock or had an interest in Peak, a wireless broadband engineering company located in Breckenridge, Colorado. Debtors assigned a zero value to their interests in all these

---

[3] At the time of Debtors' filing, their primary residence was in Arizona.

-5-

entities.

Schedule E showed priority unsecured debt consisting of substantial amounts owed to the Colorado Department of Revenue and the Internal Revenue Service for employment taxes by Netbeam or Peak, and for personal income taxes. Schedule F showed debt owed on equipment leases and vehicles for Netbeam. Those amounts, along with credit card and other miscellaneous unsecured debt, totaled $359,000.

Finally, Debtors' Amended Schedule I showed combined average monthly income as $15,094. Of that amount, $9,000 was attributed to income from their businesses and $3,000 was attributed to income from rentals on the Breckenridge Property. Amended Schedule I also reflected that both debtors were collecting social security income and Gregory was receiving a pension from IBM of $594 a month. Amended Schedule J showed average monthly expenses of $13,698, which included $6,730.18 towards the debt on the Breckenridge Property. Debtors' monthly net income was reflected at $1,395.84.

P+P immediately moved for relief from stay on the Breckenridge Property. Washington Mutual later filed a similar motion.

C.   **Debtors' Initial Plan**

Debtors' initial plan provided for, among other things, payments to satisfy their mortgage and other debt related to the Breckenridge Property, with the exception of the claims of P+P. Debtors stated their belief that they had paid P+P in full.[4]

_____

[4] Debtors were also seeking to set aside P+P's default
(continued...)

-6-

Under the heading "Implemention of the Plan", the plan provided:

> Upon confirmation, all of the assets of the Debtors'
> estate shall be vested in the Debtors and the Debtors
> shall continue to work in their consulting and
> business management company. Debtors shall pay all
> expenses of their personal life, including taxes and
> insurance costs, on a current basis. The Debtors'
> disposable income shall be deposited into the Plan
> Fund and distributed as provided herein.

### D.    **Debtors' First Amended Plan**

After a status conference on this plan, Debtors filed a first amended plan which provided for P+P's claim in the event the state court default judgment against them was upheld. The plan also provided that to the extent P+P's claim was unsecured, its claim would be paid pro rata with the other general unsecured claims. Debtors proposed to pay $634 per month to unsecured creditors.[5]

Before any hearing took place on Debtors' first amended plan, the bankruptcy court granted P+P's motion for relief from stay on the Breckenridge Property by order entered on September 12, 2008. The bankruptcy court later granted Washington Mutual's relief from stay motion on the Breckenridge Property by order entered on April 9, 2009. Eventually, Washington Mutual foreclosed on the Breckenridge Property. Due to the collapse of the real estate market, P+P's secured claim against the Breckenridge property became entirely unsecured.

---

[4](...continued)
judgment against them in the state court.

[5] From our review of the docket, it does not appear that a hearing on this plan ever took place. Presumably, this plan was withdrawn when Debtors filed their second amended plan.

**E.   Debtors' Second Amended Plan**

In early February 2010, Debtors filed their second amended plan. For confirmation purposes, this plan only needed to address the priority and secured claims of the taxing authorities and Debtors' general unsecured claims, including the claims of P+P.[6] Debtors' proposed statement of implementation of the plan remained the same; i.e., upon confirmation, their assets, including their equity interests in their businesses, would revest in Debtors and they would continue to work and contribute all their disposable income to the plan. The proposed payment of $634 a month to unsecured creditors was not altered.

According to Debtors' second amended disclosure statement, their combined monthly income went from $15,094 to $6,297. The $6,297 figure consisted of $2,000 income from Debtors' businesses with the remaining amounts attributed to Gregory's IBM pension and Debtors' combined social security income.

P+P, Debtors' largest unsecured creditor, voted against the second amended plan and filed an objection[7] on the grounds that it (1) violated the absolute priority rule because Debtors' plan left their ownership interests in "valuable" property untouched

---

[6] Debtors' second amended plan separately classified Washington Mutual's secured claim against the Breckenridge Property in Class 3 and provided for P+P's secured claim against the Breckenridge Property in Class 5. Most likely, Washington Mutual foreclosed on the property after Debtors had filed this latest version of their plan.

[7] The Internal Revenue Service and the U.S. Trustee also objected to the second amended plan on various grounds.

-8-

while paying unsecured creditors only $634 a month; (2) violated the best interests of creditors' test under § 1129(a)(7) because Debtors had not properly disclosed the value of their business interests in AZCI and Blue River; and (3) was filed in bad faith. In connection with its objection, P+P offered the opinion of an expert that ACZI had a value of $605,000 to $662,500 as of the date of the petition.[8]

### F. The Debtor's Modification to their Second Amended Plan

On June 3, 2010, Debtors filed a modification to their second amended plan. The modification increased the payments to unsecured creditors on a monthly basis following the effective date, based on anticipated growth in Debtors' business ventures.

The bankruptcy court conducted a hearing on Debtors' second amended plan and only addressed the applicability of the absolute priority rule found in § 1129(b)(2)(B)(ii). The

---

[8] P+P's objection also implicated § 1129(a)(15) because it complained that Debtors' expenses were unreasonable. Section 1129(a)(15) states:

In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in § 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

bankruptcy court, recognizing the split of authority throughout the nation, concluded that the absolute priority rule applied to individual chapter 11 plans. On February 17, 2011, the bankruptcy court entered the order denying confirmation of Debtors' second amended plan. In the order, Debtors were instructed to filed a third amended plan and disclosure statement by March 1, 2011.

Debtors did not further amend their plan. Instead, they filed an appeal of the order denying confirmation of their second amended plan. On March 7, 2011, the bankruptcy court conducted a show cause hearing as to why Debtors' case should not be dismissed or converted. The court issued a Memorandum Decision and converted the case to chapter 7, finding that (1) Debtors failed to comply with an order of the court, (2) there was an absence of a reasonable likelihood of rehabilitation, and (3) Debtors failed to file a disclosure statement, or file or confirm a plan within the time fixed by order of the court, § 1112(b)(4)(J). The bankruptcy court entered the order converting Debtors' case on March 11, 2011.[9]

Debtors moved for a stay pending appeal. On March 29, 2011, the bankruptcy court granted the motion in a Memorandum Decision, staying the proceedings pending the adjudication of this appeal. The bankruptcy court again recognized the split of

---

[9] When the bankruptcy court converted Debtors' case, the order denying confirmation of their second amended plan became a final order. See Giesbrecht v. Fitzgerald (In re Giesbrecht), 429 B.R. 682, 687 (9th Cir. BAP 2010); see also Rosson v. Fitzgerald (In re Rosson), 545 F.3d 764, 770 (9th Cir. 2008) (order converting case from chapter 13 to chapter 7 is a final order).

authority on the issue of whether the absolute priority rule applied to individual chapter 11 debtors and, therefore, found Debtors had a chance of success on appeal. In addition, the bankruptcy court found that Debtors would suffer irreparable injury if no stay was granted because their businesses could be sold in chapter 7, leaving them without the ability to earn a living. The bankruptcy court also found that the harm to the IRS and P+P was merely delay. Finally, the bankruptcy court stated that as a policy question, the public interest would be advanced by obtaining a ruling from this Panel on the applicability of the absolute priority rule in an individual chapter 11 case. The bankruptcy court entered the order staying the conversion of Debtors' case on March 29, 2011. Despite the stay, Debtors received their chapter 7 discharge on September 22, 2011.[10]

## II.   JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## III.   ISSUE

Does the absolute priority rule in § 1129(b)(2)(B)(ii)

---

[10] The order simply stated: "IT IS ORDERED GRANTING the Appellants' Motion for Stay Pending Appeal, IT IS FURTHER ORDERED STAYING the Chapter 7 Conversion Order of this Court Dated February 17 and March 10, 2011." It is possible that the court and the parties contemplated that the chapter 7 would proceed with respect to Debtors and their discharge, but that the liquidation of their estate was stayed until this appeal concludes.

-11-

apply to chapter 11 debtors who are individuals?[11]

## IV.   STANDARD OF REVIEW

This appeal raises a statutory interpretation question which we review de novo. AMB Prop., L.P. v. Official Creditors (In re AB Liquidating Corp.), 416 F.3d 961, 963 (9th Cir. 2005). A de novo review allows us to examine the interpretation and application of the relevant statutes independent of the bankruptcy court's determination.

## V.   DISCUSSION

### A.   The Absolute Priority Rule

The absolute priority rule, and issues within its realm, are significant mainstay topics for most bankruptcy practitioners and jurists of the last quarter of the 20th and early 21st centuries. Once only held closely in the hearts and minds of commercial and business reorganization counsel, since the passage of the 2005 BAPCPA[12] the absolute priority rule, as

---

[11] We do not reach Debtors' second issue of whether they could avoid a strict application of the absolute priority rule by contributing "new value" into a plan of reorganization in the form of exempt assets for two reasons. First, the bankruptcy court did not make any findings on this issue. Second, it is not readily apparent from the record whether Debtors had exempt assets which were not encumbered by the IRS's liens. Thus, Debtors appear to be seeking an advisory opinion on this issue. However, we lack jurisdiction to render advisory opinions. See Kittel v. Thomas, 620 F.3d 949, 951 (9th Cir. 2010); see also Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 195-96 (9th Cir. BAP 2003) (noting that when bankruptcy court did not make the requisite factual findings that debtor had satisfied the new value corollary, it was unnecessary to decide if debtor, who was individual, could invoke the exception in chapter 11 case).

[12] The Bankruptcy Abuse Prevention and Consumer Protection
(continued...)

amended, has now crossed over to the general consumer bankruptcy practice world.[13]

The absolute priority rule initially was a judicially created concept, arising from a series of early twentieth-century railroad cases including N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508 (1913). The U.S. Supreme Court adopted the absolute priority rule to prevent deals between senior creditors and equity holders that would impose unfair terms on unsecured creditors.

An interesting feature of the absolute priority rule, even before enactment of the BAPCPA amendment to § 1129(b)(2)(B)(ii)[14], is that the rule has never been absolute. For instance, the U.S. Supreme Court in Kansas City Terminal Ry. Co. v. Cent. Union Trust Co., 271 U.S. 445, 455 (1926), albeit in dicta, recognized that a new, substantial, and necessary contribution could allow an old equity holder to retain an interest in the reorganized debtor. This contribution was

---

[12](...continued)
Act of 2005, Public Law 109-8, 119 Stat. 23.

[13] There is no doubt that the absolute priority rule was a necessary feature to be considered in individual debtors' chapter 11 plans of reorganization prior to the enactment of BAPCPA. However, Congress has not significantly increased the outer limits of eligibility for chapter 13 debtors and a combination of the present day national economic climate, the amendment to § 1129(b)(2)(B)(ii) and the addition of the new § 1115 has presented consumer bankruptcy lawyers with growth opportunities in the individual debtor chapter 11 practice.

[14] The absolute priority rule was codified at § 1129(b)(2)(B)(ii) with the enactment of the Bankruptcy Code in 1978.

commonly called the "new value corollary." Later, in <u>Case v. Los Angeles Lumber Products Co.</u>, 308 U.S. 106 (1939), the U.S. Supreme Court considered an offer by shareholders to continue their participation in the company's business after confirmation of the plan of reorganization, which finally confirmed and clarified the new value corollary.[15]

The absolute priority rule (as it pertained to unsecured creditors) was eventually codified in 1978, within § 1129(b)(2)(B)(ii). Interestingly, and despite years of case law by that time, no reference was made to "absolute priority" or "new value" in that codification. The words "absolute priority" or "new value" do not appear anywhere in § 1129.

Other nuances with respect to the absolute priority rule developed following its codification, with courts finding other "exceptions" besides the new value corollary that do not appear in the text of the statute. For instance, in 2001, the 9th Circuit Court of Appeals in <u>Security Farms v. Gen. Teamsters, Warehousemen and Helpers Union, Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890)</u>, 265 F.3d 869, 874 (9th Cir. 2001), found that the absolute priority rule did not apply to organizations where their members did not hold "equity interests" in the entity (even though the term "equity interest" does not appear in § 1129(b)(2)(B)(ii)).

---

[15] The U.S. Supreme Court stated that the shareholders had to do more than just continue to participate in the debtor's business to retain their equity. Instead, they must contribute money or money's worth. 308 U.S. at 122. In other words, they must contribute new value to the debtor. With this, the new value corollary was indeed crystallized.

-14-

In that case, the Ninth Circuit, relying on the Seventh Circuit's case of In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1315 (7th Cir. 1995), agreed that the term "interest" in § 1129(b)(2)(B)(ii) meant equity interest in a for-profit corporation. These cases undertook a historical review of the absolute priority rule, delving into the fact that the "absolute priority rule" had (at least) one specific mission - to undermine corporate shareholders' advantages over unsecured creditors.

Prior to the enactment of BAPCPA, an individual debtor's plan needed to meet the requirements of the absolute priority rule.[16] "Interest" as it appears in § 1129(b)(2)(B)(ii) has various meanings, and the individual debtor's ownership rights in estate property, as that property is defined from time to time by the Bankruptcy Code and judicial interpretations, are perfectly harmonized within the absolute priority rule, both prior to and after BAPCPA's enactment.

Two points are to be drawn here. First, courts have always reviewed § 1129(b)(2)(B)(ii) through the lens of common sense and have approached legislative interpretation in a way to facilitate the goals of the statute. Second, simply because words may have alternative meanings, ambiguities do not necessarily arise. The words, all of them, should be read in context with the sentence, the paragraph, and the entire text of the statute (in this case, the Bankruptcy Code). As in the case

---

[16] Courts almost universally found that individuals could reorganize and that the absolute priority rule applied to their plan prior to the enactment of BAPCPA.

-15-

of "interest" in § 1129(b)(2)(B)(ii), words have various meanings depending on their underlying required usages, but no real reasonable ambiguity is created simply because of those various usages.

## B.    The Methodology of Statutory Interpretation

How do we endeavor to understand the parts of §§ 1129(b)(2)(B)(ii) and 1115 as they relate to the applicability of the absolute priority rule to individual chapter 11 debtor plans?  We are first guided by primary principles.

"The interpretation of the Bankruptcy Code first begins with the language itself.  See In re Griffith, 206 F.3d 1389, 1393 (11th Cir. 2000); United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989).  If the language is plain and unambiguous, then the Court must enforce the Bankruptcy Code according to its terms.  Id." In re Gosman, 282 B.R. 45, 48 (Bankr. S.D. Fla. 2002).

The U.S. Supreme Court in Lamie v. U.S. Trustee, addressed this point directly:

> The starting point in discerning congressional intent is the existing statutory text, see Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999), and not the predecessor statutes.  It is well established that "when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms." Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) (internal quotation marks omitted) (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989), in turn quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)).

Lamie, 540 U.S. 526, 534 (2004).

In interpreting the Bankruptcy Code, the U.S. Supreme Court

-16-

has held "as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." BFP v. Resolution Trust Corp., 511 U.S. 531, 566 (1994).

Thus, we look to the statutory language at issue.

## C.  The Plain Meaning of the Absolute Priority Provisions

The requirements for confirmation of a plan of reorganization are generally set out in § 1129, which provides two separate and distinct paths for successful confirmation. The first path is mapped out in the sixteen paragraphs of § 1129(a).  If a plan proponent can demonstrate to the satisfaction of the court that each and every requirement contained in paragraphs (1) through (16) of § 1129(a) has been met, a plan can be confirmed.  Of particular note is the requirement of obtaining the consent of each class of creditor as required by paragraph (8) of § 1129(a).

A second path to confirmation is established pursuant to § 1129(b), where absent consent of each class of creditor (as required by § 1129(a)(8)), a plan may still be confirmed by the bankruptcy court if (1) the fifteen remaining paragraphs of § 1129(a) are met, and (2) the plan is, among other things, "fair and equitable."  This nonconsensual method of confirmation is referred to as "cramdown."[17]  The burden of demonstrating that the plan is "fair and equitable" in order to obtain confirmation falls on the plan proponent.

---

[17] See Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

-17-

The Bankruptcy Code provides guidance as to whether a plan is "fair and equitable" as to unsecured creditors. Section 1129(b)(2)(B)(ii), known as the "absolute priority rule", provides that a plan is "fair and equitable" if:

(B) With respect to a class of unsecured claims—
. . .
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added).[18]

Simply put, a plan not paying an unsecured creditor in full is nevertheless "fair and equitable" (and can be crammed down over the unsecured creditor's objections), so long as an individual debtor does not retain property except property included in the bankruptcy estate under § 1115.

Therefore, one must now consider the companion section to § 1129(b)(2)(B)(ii), § 1115, to determine what property was included in the bankruptcy estate when the debtor is an individual.

We believe that § 1115[19] plainly identifies an individual

---

[18] The BAPCPA amendments of 2005 added the emphasized portion of § 1129(b)(2)(B)(ii), appearing above.

[19] Section 1115 reads as follows:

**Section 1115. Property of the estate**
(a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541—

(continued...)

-18-

chapter 11 debtor's estate as

(1) Property specified in § 541 (i.e., "property of the estate includes, <u>in addition to the property specified in section 541</u>") (emphasis added);

(2) All property of the kind specified in § 541 that the (individual) debtor acquires after the commencement (but before the closure, dismissal or conversion) of the case; and

(3) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

Application of "plain-meaning analysis" has been set out in the recent 9th Circuit BAP decision <u>Barnes v. Belice (In re Belice)</u>, 461 B.R. 564 (9th Cir. BAP 2011). In that opinion, the BAP was critical of the bankruptcy court's application of the plain-meaning analysis.

---

[19](...continued)
    (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
    (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

(b) Except as provided in section 1104 or a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate.

11 U.S.C. § 1115.

> Without considering the relationship of the phrase in question to the contextual statutory scheme or the logical impact of their broad interpretation on that scheme, they improperly emphasize one meaning of the words to the exclusion of all other considerations. See Corley v. United States, 129 S. Ct. 1558, 1567 n.5 (2009).

Belice at 577.

With this guidance in mind, we consider here, and later in our opinion, our plain-meaning interpretation of the language contained in §1129(b)(2)(B)(ii) and § 1115 within the contextual statutory scheme and logic of plan confirmation requirements of Chapter 11.

First, we observe that there are no conflicting provisions within Chapter 11 relative to our view that the absolute priority rule does not apply in individual chapter 11 cases. We find no anomalies, inconsistencies or conflicts created by this interpretation. More importantly, we find significant contextual concordance with the other requirements for plan confirmation, including those previously described, including but not limited to (1) the new requirement for dedication of all of debtor's disposable income for five years, (2) the straight-forward best interest of creditors test, and (3) the delay of issuance of discharge until the plan has been fully consummated. Including the § 541 property within the universe of property contained in § 1115, as we believe a plain-meaning interpretation requires, does no violence to the logical impact of the reorganization process or scheme established in chapter 11. Indeed, especially combined with the new additional requirement of five years of debtor's disposable income, it is illogical to thereafter remove the debtor's means of production

-20-

of debtor's disposable income by maintaining the absolute priority rule in an individual's case.

The dissent argues that the rule of statutory construction guides that, where possible, one must avoid rendering any parts superfluous. (Citing TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)). The dissent further argues that "the broad construction the Panel advocates causes parts of the Code to become superfluous. For example, § 103(a) makes § 541, which states that an estate is created upon the filing of a petition, applicable in chapter 11 cases. Section 103(a) was not amended by BAPCPA. But the broad view makes § 103(a) inapplicable in individual chapter 11's." However, the argument proves too much and is incongruent with the reality of the Bankruptcy Code. Section 1115 mirrors § 1306 which was part of the 1978 Code concurrent with enactment of § 103(a). Nobody, ever, has argued that § 1306 made § 103(a) surplusage, and there is no reason for this Panel to do so with respect to § 1115. To do otherwise would create an indefensible discontinuity between § 1115 and § 1306.

Section 1115's identification of estate property consists of the property contained in § 541 and the two post-petition acquired assets - newly acquired property and income. The so-called disputes over what "included" means in § 1129(b)(2)(B)(ii) and "in addition to" in § 1115 arise from misinterpretation of the words. "Included" is not a word of limitation.[20] To limit the scope of estate property in §§ 1129

[20] See Bankruptcy Code § 102(3) and especially see Am.
(continued...)

-21-

and 1115 would require the statute to read "included, except for the property set out in Section 541" (in the case of § 1129(b)(2)(B)(ii)), and "in addition to, but not inclusive of the property described in Section 541" (in the case of § 1115).

A plain reading of §§ 1129(b)(2)(B)(ii) and 1115 together mandates that the absolute priority rule is not applicable in individual chapter 11 debtor cases. Accord SPCP Group, LLC v. Biggins, ___ B.R. ___, 2011 WL 4389841, at *3-5 (M.D. Fla. Sept. 21, 2011) (declined to follow In re Gelin, 437 B.R. 435 (Bankr. M.D. Fla. 2010), which followed the narrow view based on an ambiguity analysis); In re Tegeder, 369 B.R. 477 (Bankr. D. Neb. 2007) (following a plain meaning analysis); In re Shat, 424 B.R. 854 (Bankr. D. Nev. 2010) (following the broad view based upon an ambiguity analysis).

### D. Analysis of Legislative History, Congressional Intent, or other Speculations

Much time has been spent by jurists and scholars on the legislative history, congressional intent, and other speculations surrounding the applicability of the absolute priority rule in individual debtor chapter 11 cases. We have reviewed a myriad of lower court decisions and articles replete with seemingly endless analyses of possible congressional intentions and various outcomes depending on the "narrow" or

---

[20](...continued)
Surety Co. v. Marotta, 287 U.S. 513, 517 (1933) in which the U.S. Supreme Court presents in that bankruptcy setting a definitive explanation for the use and meaning of the word "include." See also Kenneth N. Klee, Bankruptcy and the Supreme Court, at 22 and n.70, 35-36, (Lexis/Nexis 2008).

"broad" view adopted by the author.

While certainly not exhaustive in scope, these decisions and articles have undertaken a titanic effort to frame their outcomes on what may be a very weak universe of original resources. However the Bankruptcy Code, as the main resource, does provide significant assistance. For instance, Congress in adopting BAPCPA's individual debtor chapter 11 provisions borrowed provisions from chapter 13. Section 1123(a)(8) was added to the Bankruptcy Code, providing that, to be confirmable, an individual debtor's plan must provide for the payment to creditors of all or such portion of earnings from personal services or other future income of the debtor – resembling § 1322(a)(1). Section 1129(a)(15) was added, giving dissenting unsecured creditors who are not being fully paid under the plan absolute veto power over the plan unless the debtor contributes an amount equal to all of his projected disposable income over the longer of five years or the plan payment period - resembling § 1325(b). Section 1141(d)(5)(A) was added, delaying the discharge until completion of all plan payments - resembling § 1328(a). Section 1141(d)(5)(B) was added, permitting a discharge for cause before all payments are completed - resembling the hardship discharge of § 1328(b). And, Section 1127(e) was added, permitting modification of a plan even after substantial consummation - resembling § 1329(a).

Finally, a plain reading of §§ 1129 and 1115 demonstrates that, just as in chapter 13, to confirm a plan does not require the application of an absolute priority rule. As in Chapter 13, the disposable income requirement insures that the individual

-23-

debtor is required to dedicate all of his or her disposable income over a designated time period (three or five years in Chapter 13, at least five years in chapter 11) to plan payments directed to unsecured creditors.

When decisions have gone further than exercising a plain reading of the statute, they have entered into speculative analyses that are fatally flawed.

As an example, the bankruptcy court in In re Gbadebo, in determining that the absolute priority rule continued to exist in individual debtor chapter 11 cases, found a so-called "anomaly" that made "no sense." The bankruptcy court said:

> Finally, if §§ 1129(b)(2)(B)(ii) and 1115 are read to eliminate the "absolute priority" rule for individual chapter 11 debtors, the Court is faced with a procedural anomaly. If the plan proposes to pay them anything, the debtor is required to send them a ballot. Yet, their vote can be ignored. This makes no sense. The Court reads §§ 1129(b)(2)(B)(ii) and 1115 to eliminate the "absolute priority" rule only as to an individual chapter 11 debtor's post-petition property. It bases this conclusion on both the language of the statute, both in isolation and viewed in the context of the Bankruptcy Code as a whole. It finds this reading most consistent with the intent of Congress as expressed in the legislative history.

In re Gbadebo, 431 B.R. 222, 230 (Bankr. N.D. Cal. 2010).

The above passage challenges the abrogation of the absolute priority rule in individual cases (with respect to pre-BAPCPA § 541 estate property) based on an apparent procedural anomaly that the debtor must solicit votes but can ignore them. No anomaly exists; those votes are not ignored. The analysis is incomplete. If the class votes yes, § 1129(a)(8) is satisfied. If the class votes no, its vote is not ignored. If the plan provides distributions of property equal to the allowed amount

-24-

of the unsecured claim, both §§ 1129(a)(15)(A) and 1129(b)(2)(B)(i) are met, and the court may confirm the plan if it is fair and equitable under § 1129(b)(1). If the plan provides for less than satisfaction in full on a present value basis and the impaired class votes no, then it may be confirmed as long as § 1129(a)(15)(B) and (b)(1) are satisfied. In essence, Congress affirmatively amended the law so that § 1129(a)(15)(B) would trump § 1129(b)(2)(B)(ii) in individual debtor cases. Thus, § 1129(b)(2)(B)(ii)'s proscription on the retention of ownership interests by an individual debtor is not an aspect of the absolute priority rule in individual debtor chapter 11 cases. In this instance, recourse to legislative history and spirited analytics is unnecessary in light of the plain meaning of this particular statute.

The Dissent disagrees with the Panel's point, stating that for one reason or another, creditors may vote against a plan without filing an objection. However, clearly, the drafters of § 1129(a)(15) tried to create symmetry between chapters 11 and 13 for individual debtors. Of course in chapter 13, unsecured creditors do not get to vote on the plan. They can only object to confirmation under § 1325(b)(1). The BAPCPA amendment to § 1129(a)(15) mirrors this treatment in chapter 11 where creditors holding claims in impaired classes have the right to vote on the plan as well as to object to confirmation. The drafter's failure to anticipate this nuance does not provide a reason to destroy the symmetry between chapters 11 and 13. The possibility that all unsecured creditors voting against the plan would simultaneously fail to object to confirmation is a

-25-

theoretical figment squarely opposed to reality. We will not interpret a statute to destroy a sensible interpretation based on such a conjecture.

## VI.   CONCLUSION

We hold that the absolute priority rule does not apply in individual debtor chapter 11 cases for the reasons stated above. Therefore, we REVERSE the orders denying confirmation of Debtors' second amended plan and converting their case to chapter 7, and REMAND the matter to the bankruptcy court for further action consistent with this opinion.

JURY, Bankruptcy Judge, dissenting:

Addressing an issue that has confronted and confounded innumerable bankruptcy courts around the country and resulted in a significant number of published opinions from those courts which split demonstratively in their results, the Panel rules that the words of the post-BAPCPA statutes about the absolute priority rule in individual chapter 11's are "plain" and subject to only one simple reading. The Panel premises this simplistic outcome on its conviction that Congress intended to align individual chapter 11's almost entirely with chapter 13's because of some alterations in the Bankruptcy Code by BAPCPA which made the two previously divergent proceedings more similar.

I disagree — not only with the holding, but also with the underlying assumptions which drive the decision. The majority's analysis would have us conclude that the definition of property of the estate found in § 541 and made applicable to all chapters

-26-

by § 103(a) has no meaning in individual chapter 11's. They would further have us conclude that one of the significant differences between chapter 11's and 13's — that classes of creditors are entitled to vote for or against confirmation in chapter 11's whereas no class vote exists in chapter 13's — has little or no importance in an individual chapter 11. Finally, their narrow reading of the meaning of the terms "included" and "in addition to" by focusing solely on §§ 1129(b)(2)(B)(ii) and 1115 causes them to overlook one of the key tenets of statutory construction: that we are to read the statute as a cohesive whole, giving all sections their due place and not creating an island of words that floats independently of the integrated continent.

Taken in this context the meaning of the words is not plain. There can be more than one cogent interpretation of their meaning and intent and I believe they do not write the absolute priority rule out of individual chapter 11's.

In addition to my disagreement with the statutory construction elements of the majority decision, I believe my colleagues have lost sight of two important policies — one of which has been an underpinning of chapter 11 determinations since the enactment of the Code in 1978 and the other of which was the primary purpose of the BAPCPA amendments in 2005. The long standing purpose behind chapter 11, as stated by the Supreme Court, is to strike a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate. See Toibb v. Radloff, 501 U.S. 157, 163 (1991). The

-27-

majority's approach loses sight of this balance, allowing the reorganized individual debtor to retain all his or her assets while disenfranchising the vote of unsecured creditors who seek more value.

More recently, the policy behind the enactment of BAPCPA was to enhance the return to creditors. As observed by many courts, "BAPCPA has been read to tighten, not loosen, the ability of debtors to avoid paying what can reasonably be paid on account of debt." In re Kamell, 451 B.R. 505, 508 (Bankr. C.D. Cal. 2011) (citing In re Gbadebo, 431 B.R. at 229); In re Lindsey, 453 B.R. 886, 904 (Bankr. E.D. Tenn. 2011) (observing that the primary purpose of BAPCPA is "'to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors.'").

The Panel's ruling eviscerates these recognized motives behind the original Code and its revisions when applied in the individual chapter 11 proceeding. Based on both of these considerations, I respectfully dissent.

**I.**

Section 1129 sets forth the requirements for the confirmation of a chapter 11 plan. The focus of this case is on § 1129(b)(2)(B)(ii) which contains the "fair and equitable" requirement. That section, which is referred to generally as the "absolute priority rule," was amended in 2005 with the enactment of BAPCPA, and provides that a plan is fair and equitable if:

    (B) With respect to a class of unsecured claims —

-28-

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, <u>except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115</u> . . . . (Emphasis added).

It is the statute's use of the word "included" and its cross reference to § 1115 which has caused interpretive problems. Namely, what property is "included" in the estate by § 1115 that an individual chapter 11 debtor may retain? Section 1115(a) provides the following definition of property of the estate for individual chapter 11 debtors:

> In a case in which the debtor is an individual, <u>property of the estate includes, in addition to the property specified in section 541</u>--

> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and

> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first. (Emphasis added).

Here, the key phrase for interpretation is contained in the preamble of the statute: "property of the estate includes, in addition to the property specified in section 541."

## A.

Before proceeding with the application of any interpretive rule, a brief review of the current state of the bankruptcy court caselaw in the Ninth Circuit is warranted. Two basic interpretations of §§ 1129(b)(2)(B)(ii) and 1115 have emerged.

Under what is called the broad view, the bankruptcy court in <u>In re Shat</u>, 424 B.R. 854 (Bankr. D. Nev. 2010) construed the

phrase "in addition to the property specified in section 541" contained in § 1115 to mean that "[s]ection 1115 absorbs and then supersedes [s]ection 541 for individual chapter 11 cases." Id. 865. In turn, the court reasoned that if § 1129(b)(2)(B)(ii) excepts from the operation of the absolute priority rule that property "included" in § 1115, then the "exception extends to all property of the estate." Id.[21] Thus, in essence, In re Shat holds that the absolute priority rule does not apply in individual chapter 11 cases. Id. at 867. In reaching its decision, the Shat court relied upon the numerous revisions in BAPCPA which make individual chapter 11's more like chapter 13[22] and also the few cases which had addressed the issue. Id. at 865-66. Nonetheless, the court acknowledged that its broad reading of § 1115 was "not without problems." Id. at 867.

Other bankruptcy courts, in equally well-reasoned decisions, have narrowly interpreted § 1115 to supplement § 541

---

[21] Under this reading, when § 1129(b)(2)(B)(ii) says "the debtor may retain property included in the estate under section 1115" it means "the debtor may retain all property of the estate." Why did it not just say that?

[22] These changes, also relied upon by the majority, included: (1) redefining property under § 1115 along the lines of property of the estate under § 1306; (2) changing the mandatory contents of a plan pursuant to § 1123(a)(8) to resemble § 1322(a)(1); (3) adding the disposable income test of § 1325(b) to § 1129(a)(15); (4) delaying the discharge until completion of all plan payments as in § 1328(a); (5) permitting discharge for cause before all payments are completed pursuant to § 1141(d)(5), similar to the hardship discharge of § 1328(b); and (6) the addition of § 1127(e) to permit the modification of a plan even after substantial consummation for purposes similar to § 1329(a). In re Shat, 424 B.R. at 862.

-30-

by adding only the debtor's postpetition earnings and other property acquired after the commencement of the case. See In re Tucker, 2011 WL 5926757 (Bankr. D. Or. 2011); In re Borton, 2011 WL 5439285 (Bankr. D. Idaho 2011); In re Kamell, 451 B.R. 505; In re Karlovich, 456 B.R. 677 (Bankr. S.D. Cal. 2010); In re Gbadebo, 431 B.R. 222. Under the narrow view, the absolute priority rule still applies to individual chapter 11 debtors with respect to their prepetition property, but postpetition property is not subject to its strictures. Notably, the Panel mentions only one of these well-reasoned decisions.

Not surprisingly, Debtors and NACBA advocate adoption of the broad view and echo an analysis similar to that in In re Shat. My colleagues accepted those arguments, but I am not persuaded. Instead, I think numerous statutory interpretive tools favor the narrow construction camp. Even if in the end of my endeavor no clear answer emerges after application of these tools, then I ask a further question not addressed by the Panel: What purpose consistent with generally recognized policies would a broad reading of the relevant statutes serve? Nowhere does the Panel address the answer to that question.

**B.**

I start my analysis with a review of the basic statutory rules by which I am bound. If the statutory language is clear, I must apply it by its terms unless to do so would lead to absurd results. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-42 (1989). I do not recite this tenet of statutory interpretation idly. Examining the language of a statute in the context in which it is used is always the

-31-

starting point.

In addition, I am instructed to construe a statute, if possible, so that "no clause, sentence or word" is rendered "superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001); see also, Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous."). Another basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results. Demarest v. Manspeaker, 498 U.S. 184, 191 (1991) (applying statute's terms where the result was not "so bizarre that Congress could not have intended it"); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). Finally, I engage in statutory interpretation by taking a holistic approach that strives to implement the policies behind the enactment of BAPCPA and harmonize the provisions of the Code. See Drummond v. Wiegand (In re Wiegand), 386 B.R. 238, 241 (9th Cir. BAP 2008). Of course, underlying all these interpretive tools is the tenet that "aids to interpretation can be used only to resolve ambiguity and never to create it." 2A Norman J. Singer and J.D. Shambie Singer, Statutes and Statutory Construction § 46:4 (7th ed. 2007). Keeping this in mind, I now apply the rules.

**C.**

There is no serious debate about whether § 1129(b)(2)(B)(ii) allows an individual chapter 11 debtor to

-32-

retain some property without running afoul of the absolute priority rule. The definition of that property is "included" in § 1115. The Panel contends that the word "included" is not a word of limitation under the Code and that, to treat it as such, the statute would read a different way than drafted; i.e., "included, except for property set out in Section 541." I cannot adopt this strained reading of the word "included."

The Panel loses sight that words have different meanings in different contexts. It is a well-established canon of statutory construction that when the word "includes" or "including" is followed by a list of examples, those examples are considered illustrative rather than exhaustive. See Vermejo Park Corp. v. Kaiser Coal Corp. (In re Kaiser Steel Corp.), 998 F.2d 783, 788 (10th Cir. 1993) (holding that the word "including" after "party in interest" in § 1109(b) indicates that the list of examples is not exhaustive of possible parties in interest); In re Adams, 275 B.R. 274, 281 (N.D. Ill. 2002) (stating that § 503(b) is a nonexclusive list of six categories of administrative claims). Thus, the "not a term of limitation" context. Here, however, the statutory use of the word "included" is not used as the preface for representative or illustrative examples. Rather, the property "included" in the estate requires further inquiry by its cross reference to § 1115 (not § 541). As a result, I believe the word "included" in § 1129(b)(2)(B)(ii) means that property "added to" the estate under § 1115.

My conclusion is consistent with my view of what § 1115 accomplishes. The introductory phrase of § 1115 states that "property of the estate includes, in addition to the property

specified in § 541 . . . ." My interpretation of the word "includes" here is derived from the fact that property of the estate is already defined in § 541. Section 1115(a) brings into the estate a debtor's postpetition property expressly excluded by § 541. See § 541(a)(6) (carving out post-petition earnings from services performed by an individual debtor after the commencement of the case) and § 541(a)(7) (making property of the estate any interest in property that the estate (not the debtor) acquires after the case). Therefore, Congress intended to add, or "include," the postpetition property to the individual chapter 11 debtor's estate in § 1115, in order to expand the estate.

This reading is compatible with the phrase "in addition to the property specified in section 541," which is not ambiguous. The ordinary meaning of "in addition to" is "a part added" or "besides". Merriam-Webster's Dictionary, http://merriam-webster.com; see also Oxford English Dictionary, http://oxforddictionaries.com ("the action or process of adding something to something else"). Accordingly, for these reasons, I believe that §§ 1129(b)(2)(B)(ii) and 1115 are most naturally understood to add to the property already defined in § 541 the property which the debtor acquires postpetition. See In re Kamell, 451 B.R. at 512 ("[T]he careful reference in § 1129(b)(2)(B)(ii) to only § 1115 and not to § 541 preserves the distinction between existing assets and those acquired post-petition because of the way § 1115 is worded (which clearly makes post-petition earnings and acquisitions an addition to § 541 property).").

In statutory construction endeavors, I am also guided by the rule that, where possible, I must avoid rendering any parts superfluous. TRW Inc. v. Andrews, 534 U.S. at 31. The broad construction the Panel advocates causes parts of the Code to become superfluous. For example, § 103(a) makes § 541, which states that an estate is created upon the filing of a petition, applicable in chapter 11 cases. Section 103(a) was not amended by BAPCPA. But the broad view makes § 103(a) inapplicable in individual chapter 11's. See In re Stephens, 445 B.R. 816, 820-21 (Bankr. S.D. Tex. 2011); In re Gelin, 437 B.R. 435, 442 (Bankr. M.D. Fla. 2010) (stating that since neither § 103(a) nor § 541 was amended by BAPCPA, "there is no reason for § 1115 to 'absorb' and 'supersede' § 541 to define property of the estate for individual chapter 11 cases.").

In short, by interpreting § 1115 to add only postpetition property to the individual chapter 11 debtor's estate, I avoid a construction which creates superfluous language and preserve the distinctions between prepetition property which becomes property of the estate under § 541 and postpetition property which becomes property of the estate under § 1115. These distinctions, which are mainstays of bankruptcy law, make it unlikely that Congress meant for § 1115 to "absorb" and "supersede" § 541. See In re Borton, 2011 WL 5439285, at *4 (finding that § 1115 "supplements § 541, but it does not supplant or subsume § 541").[23]

---

[23] This interpretation of § 1115 is consistent with one circuit court's view of what the companion chapter 13 provision,
(continued...)

-35-

There are other textual difficulties with the broad view. For example, an adoption of the broad view likely eliminates § 1129(b)(2)(B)(i),[24] if not renders it an absurdity.

> The 'broad view' necessarily eliminates subsection (B)(i) as well, even though none of its language was amended in BAPCPA, because otherwise the statute would express a nonsensical and harsh alternative in (B)(i) to a much more lenient if not entirely inapplicable subsection (B)(ii) which, in the 'broad view,' allows the individual debtor to keep all of his pre-petition property and all post-petition property not already dealt with at § 1129(a)(15). This is another reason the court doubts the 'broad view,' because it makes subsections (B)(i) and (B)(ii), expressed as alternatives, into an absurdity. Since the BAPCPA language referencing individuals is only included in alternative (B)(ii), (B)(i) remains there as a nullity respecting individuals in the 'broad view.'

In re Kamell, 451 B.R. at 508 n.3.

In their result-driven approach, my colleagues do not address any of these problems.

**D.**

I also disagree with the Panel's statement that "Congress affirmatively amended the law so that § 1129(a)(15)(B)[25] would

---

[23](...continued) § 1306, means to a chapter 13 estate. In In re Seafort, ___ F.3d.___, 2012 WL 469723,*4 (6th Cir. 2012), the court found that "section 1306(a) expressly incorporates section 541. Read together, § 541 fixes property of the estate as of the date of filing, while § 1306 adds to the 'property of the estate' property interests which arise post-petition." (Emphasis added).

[24] This section provides in relevant part that "with respect to a class of unsecured claims--(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim[.]"

[25] Section 1129(a)(15)(B) provides:

(continued...)

-36-

trump § 1129(b)(2)(B)(ii) in individual debtor cases." Notably, the Panel reached this conclusion without explaining how. The Panel overlooks that § 1129(a)(15) is only triggered when the holder of an allowed unsecured claim <u>objects</u> to confirmation of the plan. An objection is clearly different than a vote under the Code. For this reason, I part company with the Panel's critique of the "so-called" procedural anomaly created by the broad view as stated in <u>In re Gbadebo</u>, 431 B.R. at 230 (stating that "[i]f the plan proposes to pay [a creditor] anything, the debtor is required to send them a ballot. Yet, [under the broad view], their vote can be ignored. This makes no sense."). It is quite possible that for one reason or another creditors may vote against a plan without filing an objection. In that event, the way I read the Code, § 1129(a)(15) would not come into play.

Moreover, under the narrow reading that I propose, an individual chapter 11 debtor would still retain property during the first five years of his or her plan. One recent decision contained the following illustration:

- A married couple files a joint Chapter 11 petition.
- At confirmation the debtors are making two separate

[25](...continued)
In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan —
. . .
(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

-37-

$700 monthly car payments to secured creditors. The plan is confirmed with the two car payments.

• One year into the plan, the debtors trade these cars for less expensive cars requiring payments of only $400 per month each.

BAPCPA's § 1129(b)(2)(B)(ii)'s exception allows the debtors to retain the savings on the cars. Under § 1325(b)(2) as incorporated by § 1129(a)(15), the $1,400.00 in car payments would have served to reduce the debtors' projected disposable income. Nevertheless, the trade-in of the cars would allow the debtors' actual disposable income to be supplemented by a $600.00 per month saving without any corresponding increase in projected disposable income—which is determined as of the petition date. Over the remaining four years of the plan, the total amount retained by the debtors would be $28,800. (The total savings per month is $600 ($300 for both cars). There are 48 months left in the first five years of the plan. Forty-eight times $600 equals $28,800.).

The debtors' actual income might increase during the plan as well—perhaps if one of the debtors received a raise or decided to work fifty hours per week instead of forty. Because debtors' projected disposable income, and monthly payments to secured creditors, were calculated based on circumstances at the beginning of the plan, the resulting difference is an amount the debtors may retain because of the exclusion contained in § 1129(b)(2)(B)(ii).

In re Lively, 2011 WL 6936363, at *4-5 (Bankr. S.D. Tex. 2011). The Lively court recognized that a creditor could attempt to modify the plan under § 1127(e), but noted that a court would not necessarily approve the modification for two reasons. "Regarding the trade-in, a modification would have the perverse result of punishing debtors for economizing. As to the example of a debtor deciding to work more hours, a debtor might return to the regular normal number of hours if the only result of the greater effort is an increased payout to creditors." Id. at n.10.

For these reasons, Congress could not have intended

-38-

§ 1129(a)(15) to replace the absolute priority rule with respect to an individual chapter 11 debtor's prepetition property.

**II.**

I also believe that the Panel has relied exclusively on what it perceives to be the literal meaning of the statutes while ignoring their purpose. I am not convinced that BAPCPA's amendments, which make some aspects of individual chapter 11 cases similar to chapter 13, translate into an abrogation of the absolute priority rule with respect to individual chapter 11 debtors. In the larger picture, this approach is demonstrably at odds with the policies behind the enactment of BAPCPA. As previously mentioned, the purpose behind BAPCPA was to have debtors pay more, not less. In re Kamell, 451 B.R. at 508 (citing In re Gbadebo, 431 B.R. at 229); In re Lindsey, 453 B.R. at 905. Furthermore, the broad view taken by the Panel destroys the careful balance between an individual chapter 11 debtor's interest in reorganizing and restructuring his or her debts and the creditors' interest in maximizing the value of the bankruptcy estate. Radloff, 501 U.S. at 163. Individual chapter 11 debtors are not simply chapter 13 debtors with larger debts. Rather, chapter 11 debtors, individuals or not, stay in possession of their property and enjoy all the rights and powers of a trustee. They are authorized to operate their business and can choose to extend their plan beyond five years. In exchange, the chapter 11 process does not leave unsecured creditors by the wayside by affording individual chapter 11 debtors the luxury to retain all pre and postpetition property at their expense.

The Panel begins its discussion by offering the history of

-39-

the absolute priority rule which it traces back to 1913. Courts and bankruptcy practitioners alike appreciate this history and the evolution of the rule with its judicially created exceptions. I am also cognizant that the rule was traditionally applied to equity interests and that the rule's mission was to undermine corporate shareholders' advantages over unsecured creditors. However, an equity interest is nothing more than an ownership interest and individuals who own businesses, like the Friedmans in this case, file chapter 11 when they are over the debt limit for chapter 13. Individuals who own a business have the same opportunities as corporate shareholders to take advantage of unsecured creditors. Thus, I discern no good reason to depart from the absolute priority rule's traditional application. Finally, I am convinced that because the absolute priority rule has been embedded in bankruptcy jurisprudence and codified for many years, we should proceed cautiously when asked to recognize an exception from the rule that Congress has not clearly expressed.

Given the history of the absolute priority rule and its evolution, I ask what conceivable reason could Congress have had for silently writing into § 1129(b)(2)(B)(ii) an abrogation of the absolute priority rule for individual chapter 11 debtors? The Panel answers this question by simply referring to amendments in BAPCPA which make individual chapter 11 cases similar to chapter 13. This, I submit, is not enough. "Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purposes." Dole Food Co. v. Patrickson, 538

U.S. 468, 484 (2003). It is the Panel's failure to consider the purpose behind BAPCPA and chapter 11 in general that has led it to construe the relevant statutes in a way that runs contrary to what Congress would have hoped for and expected by the amendments in BAPCPA.

**III.**

I finish by addressing the NACBA's argument that retention of the absolute priority rule makes it virtually impossible for sole proprietors, who are individual chapter 11 debtors, to confirm a plan of reorganization. I am not convinced that application of the rule makes it "impossible" for sole proprietors to confirm their plans. Plan acceptance may occur through a variety of tools used by chapter 11 debtors prior to the enactment of BAPCPA: they may negotiate a consensual plan,[26] pay higher dividends, pay dissenting classes in full, or comply with the absolute priority rule by contributing prepetition property. In re Kamell, 451 B.R. at 512; In re Gbadebo, 431 B.R. at 229-30. Even so, I am not at liberty to read words into a statute simply because I perceive the existing words to lead to a harsh result.

**IV.**

Other than the arguments regarding the absolute priority rule, Debtors have not pointed out any additional errors relating to the conversion of their case. Thus, those arguments

---

[26] NACBA ignores the very practical consideration that if plan failure results in conversion to chapter 7, the classes of unsecured and junior secured creditors often receive very little. These classes have traditionally been highly motivated to negotiate.

-41-

are waived for purposes of this appeal. <u>Smith v. Marsh</u>, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

**V.**

In sum, for all these reasons, I respectfully dissent. I would hold that the absolute priority rule applies to an individual chapter 11 debtor's prepetition property, but that the rule has been abrogated with respect to postpetition property under the plain terms of §§ 1129(b)(2)(B)(ii) and 1115. Therefore, I would AFFIRM the order denying confirmation of Debtors' second amended plan and the order converting their case to chapter 7.