**In re Ernest Gregory O'NEAL and Nancy Mapes O'Neal, Debtors.**

**No. 1:11–bk–72792M.**

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

April 12, 2013.

---

8. *See In re Lang,* 398 B.R. 1, 4 (Bankr.   N.D.Iowa 2008) (citation omitted).

Stephen L. Gershner, Davidson Law Firm, Little Rock, AR, for Debtors.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

On June 15, 2011, Ernest O'Neal and Nancy O'Neal (Debtors) filed a voluntary petition for relief under the provisions of Chapter 12 of the United States Bankruptcy Code. On June 28, 2011, the case was converted to a case under Chapter 11 on the Debtors' motion.

The Debtors filed a second amended Chapter 11 plan of reorganization on May 1, 2012. An objection to confirmation was filed by Arkansas Development Finance Authority (ADFA). A hearing on confirmation was conducted in Little Rock, Arkansas, on September 13, 2012. After the confirmation hearing, the matter was taken under advisement. Briefs have been filed by the Debtors and ADFA.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) and the Court has jurisdiction to enter a final judgment in this case.

### I.

### BACKGROUND

The Debtors, husband and wife, reside in Ashley County, Arkansas, and conduct a large farming operation. In 2012, the Debtors farmed a total of 1,700 acres consisting of 1,250 acres of cotton, 400 acres of corn and 79 acres of soybeans. (Debtors' Ex. 7; Tr. at 23 & 51.) The Debtors farming operation is performed by the

Debtors individually and two entities created by them. The Debtors individually own 615 acres of farm land in Ashley County, Arkansas, and a personal residence in Wilmot, Arkansas. The Debtors own 100% of the stock in Earnest O'Neal, Inc., which in turn owns 208 acres of farm land in Ashley County, Arkansas, and all of the farming equipment and machinery used in the Debtors' farming operation. (Tr. at 23.) The Debtors created O'Neal Farm Partnership (the Debtors are equal partners), which is used to conduct the farming operation. The partnership owns no property except crops when they exist. The balance of the 1,700 acre farming operation is conducted by the partnership on rented land. (Tr. at 24.)

The Debtors and Earnest O'Neal, Inc., together own 823 acres of farm land which the Debtors value at $2,700.00 per acre for a total value of $2,235,600.00. The Debtors value the farm land owned by them individually at $1,660,050.00 and value the farm equipment owned by Earnest O'Neal, Inc., at $452,075.00. (Tr. at 27.) The Debtors value their personal residence at $60,000.00. (Tr. at 116.)

The Debtors' second plan of reorganization creates seven classes of creditors and one class of interest holders.

### Class I
### ADMINISTRATIVE CLAIMS

This class consists of creditors holding administrative claims. The plan does not state the name of any Class I creditor or the amount of any claim. This class is to be paid in full upon confirmation if the claim is pre-confirmation; post-confirmation claims are to be paid upon Court approval. The class is designated as unimpaired.

### Class II
### PRIORITY TAX CLAIMS

This class consists of creditors holding priority tax claims. The plan states that no allowable Class II claims exist although it states that the Internal Revenue Service has filed a claim for $5,100.00 for 2008 income taxes which the Debtors dispute. The plan further provides that if any claims are filed and allowed they will be paid in five equal installments with interest beginning one year from the date of confirmation. The class is designated as impaired

### Class III
### UNITED STATES FARM SERVICE AGENCY

This class consists of the claim of Farm Service Agency (FSA) in the sum of $160,000.00. The plan treats this class as a secured claim to be paid according to the terms of a note dated July 28, 2009. The note was not introduced into evidence, although an addendum to the note was introduced which referred to the original note. (Debtors' Ex. 8.) The addendum is dated April 23, 2010, and reflects the debt to be $155,960.00 and calls for installment payments in annual amounts of $11,225.00, with a final installment due July 28, 2025. Interest is computed at 3.75% per annum on the unpaid principal balance. The plan provides that the claim will be paid "in accordance with contract terms." The amount scheduled on the petition is $152,298.00. The class is designated as unimpaired.

### Class IV
### DELTA TRUST & BANK

This class consists of the claim of Delta Trust & Bank (Delta). The treatment of this claim is convoluted and at times contradictory. The claim in this class is treated as secured.

The plan states that Delta is owed a total of approximately $2,058,000.00 secured in part by land owned by the Debtors individually, rents from the Debtors' farm land, the Debtors' stock in Earnest

O'Neal, Inc., and life insurance policies. Treatment of this class provides: "This creditor shall be paid the value of its collateral or $1,661,800.00.... This claim shall be paid at the contract rate of 6.75% per annum in three annual [sic] installments of $183,056.71 beginning March 27, 2013 and the same day of each year thereafter until paid."[1] The balance of the $2,058,000.00 claim ($396,200.00) and the balance of an unpaid crop production loan from 2009 ($179,652.00) is treated as unsecured, notwithstanding that the balance of the claims are fully secured by assets of Earnest O'Neal, Inc., and the life insurance policies valued at $28,408.00.[2] The plan states that it shall not affect the obligation of non debtor entities to comply with original contract terms with Delta. The plan also states, "[a]lthough the Debtors are confident that in the absence of a default the loan will be renewed by DTB [Delta] at the expiration [sic] renewal of the loan and interest rate shall be subject to negotiation."

### CLASS V

### DELTA TRUST & BANK

This class consists of the claim of Delta in the sum of $42,245.00 secured by a mortgage on the Debtors personal residence in Wilmot, Arkansas. The plan states that the note matures February 15, 2013, and that "the loan will be extended until through [sic] the life of the plan subject to annual interest adjustments and shall be paid at in [sic] accordance with current contract terms." The plan then states, "[e]xcept as modified herein, the loan documents ... remain in full force and effect." The class is stated to be impaired.

### Class VI

### UNSECURED CLAIMS

This class consists of allowed unsecured claims. The plan proposes to pay this class pro rata from farming operations. The first payment will be made on or before January 31, 2013, and, thereafter, on January 31st of each year over the life of the plan. No amount of payment is stated in the plan and no creditors are named as unsecured creditors in this class. The plan also does not state whether or not the class is impaired.

### Class VII

### EQUITY SECURITY HOLDERS

This class consists of the Debtors individually and provides that all property of the estate shall vest in them upon confirmation of the plan. The plan does not state whether the class is impaired or unimpaired.

### MEANS OF EXECUTION

The plan proposes to pay creditors from income generated by the combined farming operations of the Debtors and their two wholly owned entities, Earnest O'Neal, Inc. and O'Neal Farm Partnership. The plan length is stated to be for five years. The farming operation will be conducted by the farm partnership by leasing farm equipment owned by Earnest O'Neal, Inc. for a lease payment sufficient to pay all indebtedness owed by the corporation to creditors holding security interests in the farming equipment. The farming partnership will also lease 280 acres of farmland

---

1. The Debtors may have meant to say that $183,056.71 was to be paid annually not in three payments of $183,056.71 per year, or that payments of $183,056.71 will be paid for three years beginning March 29, 2013. The note (No. 7701355) calls for payment of all principal and interest on March 27, 2012. (Debtors' Ex. 4.)

2. The life insurance policies were scheduled on the petition and the Court assumes these are cash surrendered values.

owned by the corporation for $44,300.00 per year and lease the Debtors' 618 acres of farm land for $94,300.00. The plan also states that:

profits (income) of OFP (Ernest O'Neal Farm Partnership) will first pay its claims and the profits (income) of EOI (Ernest O'Neal, Inc.) will first pay its obligations in the ordinary courts [sic]. The remaining profits will be used to pay the O'Neals [sic] living expenses, and to fund the plan. Pre petition secured claims will be paid first, thereafter, holders of administrative expense claims and priority and unsecured creditors shall be paid in accordance with the priorities of the bankruptcy code. Ernest O'Neal is 63 years old and Nancy O'Neal is 61. If the O'Neals draw social security before completion of the plan it will be applied toward their living expenses and will increase disposable income.

The plan further provides that the farming operation will be financed through periodic production loans over the life of the plan. The production lender will be Delta and the collateral for the production loans will be all of the assets of the Debtors, O'Neal Farms, Inc., and Ernest O'Neal Farm Partnership. The Debtors' production loan will also be subject to a 90% guaranty by the FSA. The Debtors anticipate that Delta will continue to provide production financing.

## THE BALLOTS

The summary of the voting by creditors resulted in the following:

| Class IV | Delta | $1,661,800.00 | Accepts |
|---|---|---|---|
| Class VI | Delta | $ 42,425.00 | Accepts |
| Class VII | Delta | $ 575,852.00 | Accepts |
| | Deere & Company | $ 260,693.18 | Accepts |
| | Agro Distribution, LLC | $ 358,232.90 | Accepts |
| | ADFA | $ 498,590.92 | Rejects |

(Debtors' Ex. 1.)

## II.

### ARGUMENT

The Debtors argue that the result of the voting is that all classes of creditors accepted the plan notwithstanding ADFA's rejection and, therefore, the plan should be confirmed because the plan meets all of the requirements of 11 U.S.C. § 1129(a).

ADFA argues that its claim should not have been put in the same class with Deere & Company's claim of $260,693.18 and Delta's claim of $575,852.00; therefore, the plan does not comply with the requirements of 11 U.S.C. §§ 1122 and 1129(a). ADFA further argues that if its claim had been properly classified the resulting class would not have been deemed to have voted to accept the plan pursuant to 11 U.S.C. § 1126(c); therefore, the plan may only be confirmed pursuant to 11 U.S.C. § 1129(b)(2)(B)(i), (ii) (the cram down). ADFA argues that since the Debtors are retaining pre-petition property under a plan which does not propose to pay the rejecting junior class of unsecured creditors in full, it violates the absolute priority rule contained in 11 U.S.C. § 1129(b)(2)(B)(i), (ii) and, therefore, cannot be confirmed.

## III.

### DISCUSSION

For a Chapter 11 plan of reorganization to be confirmed, the requirements of 11 U.S.C. § 1129(a) must be met. This section has 16 prerequisites for confirmation

and all must be met except 11 U.S.C. § 1129(a)(8), which provides that each class must accept the plan or be unimpaired. The plan may still be confirmed over the dissent of one or more classes of impaired creditors if the plan complies with all requirements of 11 U.S.C. § 1129(a) and the cramdown standard set forth in 11 U.S.C. § 1129(b).

■ In addition to the considerations of objections raised by parties in interest, this Court has a mandatory independent duty to determine whether the plan has met all of the requirements of confirmation. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 130 S.Ct. 1367, 1381, 176 L.Ed.2d 158 (2010) (stating that bankruptcy court has obligation to ensure Chapter 13 plan complies with the Code even if the creditor fails to object); *Burnett v. Burnett (In re Burnett)*, 646 F.3d 575, 581 (8th Cir.2011) (recognizing that bankruptcy court, pre-confirmation, bears an independent duty to assure compliance with Title 11 even if no objection is lodged); *Williams v. Hibernia Nat'l Bank (Matter of Williams)*, 850 F.2d 250 (5th Cir.1988) (citing *In re Holthoff*, 58 B.R. 216, 218 (Bankr.E.D.Ark.1985)) (acknowledging court's independent duty to determine whether the plan has met all the necessary requirements for plan confirmation).

## A.

## 11 U.S.C. § 1123

■ 11 U.S.C. § 1129(a)(1) provides that the plan must comply with the applicable provisions of this title. 11 U.S.C. § 1123(a) which is an applicable provision of Chapter 11 provides in relevant part as follows:

Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest....

This plan does not comply with section 1123, and, therefore, cannot be confirmed. The Debtors' plan fails to specify, with the exception of Delta and FSA, the name of any creditor and the class to which the creditor is assigned. The plan fails to provide any treatment for the claim of Deere & Company, even though the evidence presented was that Earnest O'Neal, Inc., and the Debtor, Mr. O'Neal, are primarily liable on several contracts. (Debtors' Ex. 11.) It is not clear from the record what the total liability of these contracts are. Three contracts are refinance loan contracts and it is unclear what collateral is being refinanced because the product identification number is not on the original security agreements. All of the contracts are secured by a security interest in favor of Deere & Company. The Debtors claim that the farm equipment was purchased by O'Neal Farms, Inc. and is therefore owned by O'Neal Farms, Inc. Deere & Company filed a proof of claim for $306,039.72 as a secured creditor and voted to accept the plan. Deere & Company's ballot does not state whether the claim is secured or unsecured. (Debtors' Ex. 1). Deere & Company later amended

its proof of claim to the amount of $260,693.18 because it received some payments since the filing of the claim. (Tr. at 13.)

The Debtors' plan also does not provide any treatment for its current crop production loan owed to Delta which on the date of the confirmation hearing was the sum of $1,126,867.77. The original note was dated February 28, 2012, in the principal sum of $1,100,000.00. The maker of the note is O'Neal Farm Partnership and is guaranteed by the Debtors individually. (Debtors' Ex. 7.) The note is secured by real estate owned by the Debtors and O'Neal Farm, Inc., and crops produced by O'Neal Farm Partnership.[3]

The description of the treatment of Delta's secured claim in Class VI is contradictory. The note matures on February 15, 2013, and all principal and interest are due. The plan states that this "loan will be extended until through [sic] the life of the plan", which is five years, "subject to annual interest adjustment." The plan then states, "[e]xcept as modified herein, the loan documents relative to this claim remain in full force and effect." Plaintiff's Exhibit 6 is the note which was in the original principal sum of $50,337.00 dated May 6, 2004. The note is payable in full each year and has been renewed each year since 2004. Principal has been reduced as of April 17, 2012, to $41,497.99.[4] If the plan is to pay the claim according to the "current contract terms" it will require payment in full of $41,479.99, and, therefore, cannot be "extended" over the five year life of the plan.

On the bankruptcy schedules the Debtors listed a debt owed individually to the USDA for $25,000.00. The claim is listed as secured by real estate owned by Earnest O'Neal, Inc. The creditor filed a claim for $26,095.20. (Debtors' Ex. 9.) The plan makes no provision for the treatment of this claim, nor does it assign the creditor to any class in violation of 11 U.S.C. §§ 1129(a)(1) and 1123(a).

## B.

### CLASSIFICATION OF ADFA CLAIM

11 U.S.C. § 1122(a) provides as follows:

[e]xcept as provided in subsection (b) of this section, a plan may place a claim ... in a particular class only if such claim ... is substantially similar to the other claims ... of such class.

■ "Substantially similar" means similar in legal character or effect as a claim against the estate, and only the nature of the claim is supposed to be relevant to classification. 7 Collier on Bankr. ¶ 1122.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); see also *John Hancock Mut. Life Ins., Co. v. Route 37 Bus. Park Assoc.*, 987 F.2d 154 (3rd Cir. 1993); *In re Holthoff*, 58 B.R. 216 (Bankr. E.D.Ark.1985); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668 (D.Mass.2000).

■ Exhibit A of the Debtors' disclosure statement reflects a compilation of the Debtors' assets and their respective values. (Debtors' Ex. 12.) The Debtors' total assets are stated to be valued at $2,497,800.00 and liabilities are $2,949,700.00 leaving a net worth of negative $451,900.00. Among the assets listed is the Debtors' interest in Earnest O'Neal, Inc., which is valued at $609,000.00. The

---

**3.** The Debtor, Mr. O'Neal, testified that he sold corn produced in 2012 and made a partial payment on the crop production loan during 2012 in the sum of $430,000.00.

**4.** The first page of Debtors' Exhibit 6 is barely legible, and, therefore, this figure may not be accurate.

so-called unsecured claim of Delta for $575,852.00, which the Debtors placed in Class VII along with the objecting creditor ADFA, is actually secured by the stock owned by the Debtors in Earnest O'Neal, Inc. ($609,000.00) plus three life insurance policies owned by the Debtors whose values are listed on the petition at a total of $28,381.00. Therefore, using these numbers, Delta has no unsecured claim and cannot be properly classified with other unsecured claims in Class VII.

If Delta's claim had been properly classified as secured in a separate class, then claims totaling $618,926.08.18 or about 55% accepted the plan and claims totaling $498,590.92 or about 45% rejected the plan in Class VII. With Delta in its own class, at least $745,011.33 worth of claims in Class VII (two-thirds of the total amount) would have to vote to accept the plan. Therefore, the plan failed to acquire the necessary two thirds vote to accept and Class VII is deemed to have rejected the plan. See 11 U.S.C. § 1126(c) (two thirds of amount of claims voting in class must accept for the class to accept).

However, at trial, the Debtors' counsel, relying on some last minute creative accounting, introduced an additional compilation which valued Earnest O'Neal, Inc. at zero. (Debtors' Ex. 12)(this additional compilation was attached to the initial compilation attached to Exhibit A of the Debtors' disclosure statement). The second set of numbers was accomplished by transferring $738,200.00 of the debt owed by the Debtors to Delta to the account of Earnest O'Neal, Inc. The Debtors and O'Neal Farms, Inc. are co-makers of the note and both are primarily liable. This change in presentation resulted in a calculation that Earnest O'Neal, Inc., has a negative net worth of $63,200.00 and the Debtors have a negative net worth of $345,000.00. The accountant was asked about the change in the numbers, but her testimony never explained why the change in presentation was made:

Q. And then, when we go down to the liabilities; again, were these numbers as of December 31st of 2011?

A. Yes.

Q. Have you subsequently updated this document.

A. Yes. We prepared an update, dated, I believe, August 27, of 2012.

Q. And if you'll turn over to the second to last page in Exhibit 12.

A. Yes, sir.

Q. Would this document be your update?

A. Yes, sir.

Q. Okay. And can you go through and explain the assets that you've described on the first page of your update?

A. Okay. On value, Earnest O'Neal, it's stated as zero, because that reflects the difference in the presentation as far as the secured debt on the land and the cash cotton entities and gin receive—gin rebate receivable are no longer reflective because they're not in existence any more. And that is the change in the assets. The liabilities have been changed to reflect the debt payments that have been made since December 31st. And that's the—that's the majority of the changes.

Q. All right. And if you will flip over to the following page, would this be your calculation as to why Earnest O'Neal, Inc., has a zero value?

A. That's correct.

Q. Okay. Let's go back to—I'm flipping you back and forth a little.

A. Okay.

Q. Let's go back to the first page of your August 27 analysis. You

show—for the O'Neals, you show a note payable of 1,661,800, Delta Trust.

A. That's correct.

Q. And you've been in the courtroom today and you would agree that would be the value that they're proposing to pay under their plan, at least as for Earnest O'Neal, Inc.'s—Earnest and Nancy O'Neal's interest in the property?

A. Yes.

(Tr. at 99–100.)

Even if the stock in Earnest O'Neal, Inc., should properly be valued at zero according to accounting standards, Delta's unsecured claim is not substantially similar to the unsecured claim of ADFA. Delta has a security interest in all of the Debtors' stock in Earnest O'Neal, Inc., whether it is valued at zero or $609,000.00. Therefore, according to state law it has the right to liquidate the stock upon any default by the Debtors regardless of whether Earnest O'Neal, Inc. defaults. See Ark.Code Ann. § 4–9–601, et seq. If Delta purchased the stock at a liquidation sale, it could then liquidate Earnest O'Neal, Inc. in an attempt to satisfy its entire claim including the portion that has been classified as unsecured. The Debtors would have no control over Earnest O'Neal, Inc. This is a fundamental difference from the rights of ADFA, whose claim to the Debtors' assets including the stock in Earnest O'Neal, Inc., is totally subordinate to Delta's

rights. See *John Hancock Mut. Life Ins., Co. v. Route 37 Bus. Park Assoc.*, 987 F.2d 154, 158 (3rd Cir.1993) ("section 1122(a) expressly provides only that claims that are not 'substantially similar' may not be placed in the same class"); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D.Del.2004)(claims that comprise one class are claimants of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims).[5]

### C.

### ADDITIONAL REASONS THE PLAN CANNOT BE CONFIRMED

■ The plan of reorganization is impossible to perform. Because the Debtors are individuals, the provisions of 11 U.S.C. § 1141(d)(5)(A) apply. This section states that in a case where the debtor is an individual:

> unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan.

The plan proposes that it is to last five years and unsecured creditors are to receive a distribution described as "pro rata." The plan proposes to pay the secured claim of Delta the sum of $1,661,800.00 over the five-year life of the plan and the Debtors must complete the plan payments to enable the Debtors to discharge the unpaid claims in Class VII.

---

**5.** ADFA argued that the Debtors classification of its claim was the result of impermissible gerrymandering. 11 U.S.C. § 1122 does not require similar claims to always be put in the same class. Gerrymandering occurs most frequently when similar claims are put in different classes to impermissibly manipulate the requirements of Chapter 11 such as obtaining a class of impaired creditors to comply with the requirements of 11 U.S.C. § 1122. See *Windsor on the River Assoc., Ltd.*

*v. Balcor Estate Fin., Inc. (In re Windsor on the River)*, 7 F.3d 127 (8th Cir.1993) ("a claim in not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion"). Gerrymandering involves what would appear to be a proper classification for what are improper purposes, whereas here we have an improper classification. Since the claims in question are not substantially similar, the issue of gerrymandering is never reached.

The Debtors' plan proposes to pay Delta the sum of $183,056.71 "until paid." This includes interest accruing at the rate of 6.75% per annum on the unpaid principal. To amortize $1,661,800.00 at 6.75% per annum with annual payments of $183,056.71 requires 15 years of payment and cannot be done in five years.[6] If the plan was construed to mean the claim was to be paid over three years at $183,056.91 per year, the secured claim will be paid even less.

Further, the written plan is not proposed in good faith in violation of the requirements of 11 U.S.C. § 1129(a)(3) because it is not the Debtors' actual plan which Mr. O'Neal freely admitted in his testimony:

Q. Now, with respect to your payments to Delta Trust under your plan, you don't expect to have Delta Trust paid a million six over five—over a five year period, do you?

A. No.

Q. And has it been your practice on the large Delta Trust loan—not your production loan—that the loan would be for a one, two, three year period, and then you would go into the bank and they would renew it for another period?

A. That's correct.

Q. And has that been your course of dealing with Delta Trust?

A. Yes.

Q. And do you have any expectation that Delta Trust will change that procedure?

A. No.

Q. And, in fact, wouldn't—isn't it true that the Delta Trust loan would be a very long term continuing obligation even after your plan is completed?

A. Yes. Hopefully, as the Judge asked me, I can get it refinanced at a cheaper interest rate.

(Tr. at 95.)

Nowhere in the plan does it specifically state or even intimate that the Debtors are proposing to discharge their personal liability to Delta on all but $1,661,800.00 of the debt they owe. The Debtors owe Delta secured debts in excess of $2,058,000.00 (not including the Debtors' home).[7]

The plan does not propose to actually pay Class VII anything. The projections made by Debtors accountant on Debtors' Exhibit 13 show that over the five-year life of the plan, payments totaling $62,000.00 can be paid to creditors in Class VII. The plan, however, does not require any specific amount of payment. It says only pro rata. The Debtors' accountant admitted that any sums left over which would be available to make the $62,000.00 payments to the Class VII creditors over five years could legitimately be used to defray next year's crop production costs leaving nothing for unsecured creditors. This is exactly what the Debtor did with the proceeds of the 2011 crop. (Tr. at 62)("No, we had to produce this year's crop. The money went into this year's crop production, if there was any.") In reality, the Debtor will never have any disposable income. Therefore, the Debtors cannot comply with 11 U.S.C. § 1129(a)(15)(B) which provides:

The court shall confirm a plan only if all of the following requirements are met:

(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

---

6. The proposed treatment of the creditor in Class III will take 12 years to complete.

7. The Debtors total debt is $2,949,700.00. (Debtors' Ex. 13.)

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor .(as defined in section 1325(b)(2)) to be received during the 5–year period beginning on the date that the first payment is due under the plan, *or during the period for which the plan provides payments,* whichever is longer." (Emphasis added).

## D.

## THE ABSOLUTE PRIORITY RULE

■ Section 11 U.S.C. § 1129(b)(2)(B)(ii) represents the codification of the fair and equitable concept derived from railroad reorganization cases in the late 19th century which includes the absolute priority rule. *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *N. Pac. Ry. Co. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Dill Oil Co., LLC v. Stephens (In re Stephens),* 704 F.3d 1279, 1282 n. 1 (10th Cir.2013). Prior to 2005, in order for a plan to be crammed down, the absolute priority rule required a dissenting creditor to be paid in full if the debtor was to retain any property.

In 2005, 11 U.S.C. § 1129(b)(2)(B)(ii) was amended and a new section 1115 was added which defines property in an individual Chapter 11. The added language in 11 U.S.C. § 1129(b)(2)(B)(ii) is in italics below:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, *except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*

The issue is stated in Collier on Bankruptcy:

The added language permits individual debtors to retain "property included in an estate under section 1115" even if a dissenting class of unsecured creditors could otherwise contend such retention violated [the] absolute priority rule.

The scope of this exception turns on the scope of the phrase "included in the estate under section 1115." Section 1115, also added in 2005, specifies that property of the estate for individual chapter 11 debtors is different than property of the estate for all other chapter 11 debtors. It specifically states:

(a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541—

. . .

(2) earnings from services performed by the debtor after the commencement of the case. . . .

Section 1115 thus creates more "property of the estate" in individual chapter 11

cases filed after the effective date of the 2005 legislation than in similar cases filed before the change. It achieves this by first specifying all property covered by section 541, and then by adding to that base one category of property previously excluded by section 541(a)(6): an individual's postpetition income from services.

As a result, section 1129(b)(2)(B)(ii)'s phrase "included in the estate under section 1115" includes, at a minimum, such postpetition income from services. Whether it includes more depends on the meaning given "included" and the construction of section 1115.

If "included" in section 1129(b)(2)(B)(ii) means only property which is added by section 1115 then it has a very narrow meaning: it refers only to postpetition income from personal services—and not to property originally specified in section 541. If, however, "included" anticipates that section 1115 supplants entirely section 541, and assumes that the property of the estate in an individual's chapter 11 case can only be found in section 1115, then it has a very broad meaning, essentially exempting individuals from the absolute priority rules as to unsecured creditors.

7 Collier on Bankruptcy ¶ 1129.04[3][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

Prior to BAPCPA, property of a Chapter 11 estate did not include earnings from post-petition personal services (e.g., fees earned by professionals such as physicians or attorneys). Property which was acquired post-petition was still property of the estate if it was proceeds, products, offspring, rents or profits of or from property of the estate. See 11 U.S.C. § 541(a)(6).

In the most recent opinion on the meaning of 11 U.S.C. §§ 1129(b)(2)(B)(ii) and 1115, the Tenth Circuit Court of Appeals observed:

> To date the Bankruptcy Appellate Panel from the Ninth Circuit and five bankruptcy courts (one of which was affirmed by a district court) have adopted a "broad view", holding that the BAPCPA amendments eliminate the APR [Absolute Priority Rule] as applied to an individual's *entire* estate.[8] In contrast, the Fourth Circuit and seventeen bankruptcy courts have reached the opposite conclusion, holding that the BAPCPA amendments only exempt from the APR that property which § 1115 *adds* to an individual estate—not the pre-petition property already defined by § 541.[9]

8. *In re Friedman,* 466 B.R. 471 (9th Cir. BAP 2012); *SPCP Grp., LLC v. Biggins,* 465 B.R. 316 (M.D.Fla.2011) (affirming unpublished decision of bankruptcy court); *In re Shat,* 424 B.R. 854 (Bankr.D.Nev.2010); *In re Johnson,* 402 B.R. 851 (Bankr.N.D.Ind.2009); *In re Roedemeier,* 374 B.R. 264 (Bankr.D.Kan. 2007); *In re Tegeder,* 369 B.R. 477 (Bankr. D.Neb.2007).

9. *In re Maharaj,* 681 F.3d 558 (4th Cir.2012) (affirming the bankruptcy court's decision in 449 B.R. 484 (Bankr.E.D.Va.2011)); *In re Lee Min Ho Chen,* 482 B.R. 473 (Bankr.D.P.R. 2012); *In re Tucker,* 479 B.R. 873 (Bankr. D.Or.2012); *In re Arnold,* 471 B.R. 578 (Bankr.C.D.Cal.2012); *In re Lively,* 467 B.R.

884 (Bankr.S.D.Tex.2012); *In re Borton,* No. 09–00196–TLM, 2011 WL 5439285 (Bankr.D.Idaho Nov. 9, 2011); *In re Lindsey,* 453 B.R. 886 (Bankr.E.D.Tenn.2011); *In re Kamell,* 451 B.R. 505 (Bankr.C.D.Cal.2011); *In re Draiman,* 450 B.R. 777 (Bankr.N.D.Ill. 2011); *In re Walsh,* 447 B.R. 45 (Bankr. D.Mass.2011); *In re Stephens,* 445 B.R. 816 (Bankr.S.D.Tex.2011); *In re Karlovich,* 456 B.R. 677 (Bankr.S.D.Cal.2010); *In re Gelin,* 437 B.R. 435 (Bankr.M.D.Fla.2010); *In re Steedley,* No. 09–50654, 2010 WL 3528599 (Bankr.S.D.Ga. Aug. 27, 2010); *In re Mullins,* 435 B.R. 352 (Bankr.W.D.Va.2010); *In re Gbadebo,* 431 B.R. 222 (Bankr.N.D.Cal.2010); see also *In re Friedman,* 466 B.R. at 476 (discussing the bankruptcy court's determina-

*Dill Oil Co., LLC v. Stephens (In re Stephens),* 704 F.3d 1279 (10th Cir.2013).

Both the Fourth Circuit and the Tenth Circuit found the language of section 1129(b)(2)(B)(ii) and 1115 ambiguous because the provisions were susceptible to more than one meaning and, therefore, sought to determine Congress' intent. See *In re Maharaj,* 681 F.3d 558 (4th Cir.2012) and *In re Stephens,* 704 F.3d 1279 (10th Cir.2013). The Fourth Circuit stated the issue as follows:

> There are two competing constructions of the "included in the estate" language. On one view the phrase "included in" means the equivalent of "added to," since property of the estate has long been defined under section 541. On another view, however, the language "included in" means something closer to "referenced" in § 1115, in which case § 541 was merely "absorbed" and "superceded" into § 1115 for individual chapter 11 debtors. See, e.g., *Kamell,* 451 B.R. at 509. On the face of the statute either construction is plausible.

*In re Maharaj,* 681 F.3d 558, 569 (4th Cir.2012).

Supporting the narrow view that the BAPCPA amendments did not abrogate the absolute priority rule is the rule of statutory construction which disfavors implied repeal of existing statutes unless clearly expressed. See *Hui v. Castaneda,* 559 U.S. 799, 130 S.Ct. 1845,1853, 176 L.Ed.2d 703 (2010) ("As we emphasized, repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest.") The Tenth Circuit pointed out that in 1952 Congress eliminated the fair and equitable requirement expressly although it was later reinstated in the 1978

tion—in an unpublished February 17, 2011 order—that the APR applies to individual

bankruptcy code. *In re Stephens,* 704 F.3d 1279, 1282 (10th Cir.2013). The *Maharaj* court observed that Congress could have easily repealed the absolute priority rule as to individuals by stating so rather than utilize the awkward and convoluted manner the supporters of the broad view claims that it did. *In re Maharaj,* 681 F.3d 558, 565–66 (4th Cir.2012). Also, Congress could have simply raised the Chapter 13 [and Chapter 12] debt limits. *In re Stephens,* 704 F.3d 1279, 1286 (10th Cir.2013); *In re Maharaj,* 681 F.3d 558, 573 (4th Cir.2012) The *Maharaj* court rejected the argument that Congress was trying to provide greater benefits to individual debtors and noted the house reports and other provisions of BAPCPA were proposed reforms that were meant to address abuses of the bankruptcy system by debtors. *In re Maharaj,* 681 F.3d 558, 574 (4th Cir.2012). The court stated:

> It is for this reason that we agree with the *Gbadebo* court's assessment that "no one who reads BAPCPA as a whole can reasonably conclude that it was designed to enhance the individual's 'fresh start.' " 431 B.R. at 229.

*In re Maharaj,* 681 F.3d 558, 574 (4th Cir.2012). The court then concluded with a final observation:

> Moreover, we remain unconvinced that the doom and gloom scenario presented by Debtors is an accurate picture of the state of bankruptcy law. Debtors assume that, if the absolute priority rule is left intact, consensual confirmation is virtually impossible. To the contrary, plan acceptance is still very much a possibility, even within the confines of the absolute priority rule. Debtors "may negotiate a consensual plan, pay higher

Chapter 11 debtors).

dividends, pay dissenting classes in full, or comply with the [absolute priority rule] by contributing prepetition property." *Friedman*, 466 B.R. at 491 (Jury, J., dissenting) (citing *Kamell*, 451 B.R. at 512; *Gbadebo*, 431 B.R. at 229–30). *In re Maharaj*, 681 F.3d 558, 575 (4th Cir.2012).

The Ninth Circuit Bankruptcy Appellate Panel determined that the language of Section 1129(b)(2)(B)(ii) is not ambiguous "within the contextual statutory scheme and logic of plan confirmation requirements of Chapter 11", explaining that,

> "Included" is not a word of limitation. To limit the scope of estate property in §§ 1129 and 1115 would require the statute to read, "included, except for the property set out in Section 541" (in the case of 1129(b)(2)(B)(ii)), and "in addition to, but not inclusive of the property described in Section 541" (in the cases of § 1115). A plain reading of § 1129(b)(2)(B)(ii), and 1115 together mandates that the absolute priority rule is not applicable in individual chapter 11 debtor cases.

*Friedman v. P + P, LLC (In re Friedman)*, 466 B.R. 471, 481–483 (9th Cir. BAP 2012). This view was not shared by one member of the three member court who vigorously dissented. In brief, the Ninth Circuit BAP concluded that the new section 1115 constitutes a definition of property of an individual Chapter 11 estate which includes property previously defined as property of a Chapter 11 estate by section 541 and additional property, particularly property from income earned post petition from personal services.

The *Friedman* court pointed out that Chapter 13 does not contain an absolute priority rule and pointed to several BAPC-PA amendments to individual Chapter 11s which are similar if not identical to Chapter 13. *In re Friedman*, 466 B.R. 471, 483

(9th Cir. BAP 2012). These provisions include section 1123(a)(8) which adds a requirement to individuals that the plan must provide payments of all or such portion of earnings from personal services or other future income of the debtor, resembling section 1322(a)(1). Section 1129(a)(15) was added which states that the plan must contribute an amount equal to the Debtors' projected disposable income over the longer of five years or the plan payment period upon objection by any unsecured creditor, resembling section 1325(b). Section 1141(d)(5)(A) was added, whereby the discharge is not granted until completion of all payments under the plan, resembling section 1328(a). Section 1141(d)(5)(B) was also added, whereby a discharge is permitted for cause before completion of payments, resembling the hardship discharge located in section 1328(b). Finally, section 1127(e) was added that permits modification of a plan after substantial consummation, resembling section 1329(a). *In re Friedman*, 466 B.R. 471, 483 (9th Cir. BAP 2012).

Other support has been found in the fact that section 1115 mirrors section 1306 which was part of the original 1978 code which gave the definition of property of the estate a broader definition in a Chapter 13 than the definition of property of the estate in Chapter 11 and Chapter 7. See *In re Friedman*, 466 B.R. 471 (9th Cir. BAP 2012); Bruce A. Markell, *The Sub Rosa Subchapter: Individual Debtors in Chapter 11 After BAPCPA*, 2007 U. Ill. L. Rev. 67, 75–76 (2007).

The weakness of the narrow view is illustrated if one were to ask the question: "If Congress was not attempting to write out of individual Chapter 11 cases the absolute priority rule, what was the purpose of all of the BAPCPA amendments to Chapter 11, including section 1115, which were obviously borrowed from Chapter

13?"[10] Chapter 13 has no absolute priority rule and would not be of much use if it did. The means test for Chapter 7 debtors created by BAPCPA was designed to move debtors who could pay something to their creditors to reorganization chapters. Here, these Debtors have no recourse to either Chapter 13 or Chapter 12 because of the debt limits imposed by Congress.

Section 1129(b)(2)(B)(ii) with respect to individual debtors eliminates the application of the absolute priority rule from property described in section 1115. Section 1115 provides that all property described in Section 541 and property from post petition personal services is included in an individual Chapter 11 estate. Section 1115 is written word for word like section 1306 and courts interpreting section 1306 have never bifurcated this section into two species of property as the narrow view does in individual Chapter 11. To read section 1115 and section 1129(b)(2)(B)(ii) as exempting only future income from the absolute priority rule renders ineffective any practical application of section 1115, especially in light of the additional requirements of section 1129(a)(15)(B). When considered in the context of all the applicable sections, section 1115 accomplishes nothing of substance under the narrow view. As one author paraphrased the explanation of the Ninth Circuit BAP in *Friedman:*

> [I]t would be "illogical" to require individual debtors to devote five years of disposable income to their plans, but remove the debtors' means of providing that income, which would be the result if the application of the absolute priority rule were to prevent debtors from retaining valuable prepetition business assets.

Andrew G. Balbus, *Continued Disagreements Over the Application of the Absolute Priority Rule to Individuals in Chapter 11: Friedman and Maharaj,* 21 Norton Bankr. L. & Prac. 755, 761 (2012).

Valid arguments can be made in support of both interpretations and no analysis of this issue is free from doubt. However, since there does not appear to be any other logical reason for all of the changes made exclusively to Chapter 11 for individuals except to make it work like Chapter 13, this Court concludes that Congress did intend for section 1115 to define all property of an individual Chapter 11 case (just as § 1322 does). Therefore, by the express terms of amended § 1129(b)(2)(B)(ii) the absolute priority rule does not apply to any property of the estate of individual Chapter 11 debtors.[11]

10. The clarity with which the amendments added to the bankruptcy code by BAPCPA were drafted has been criticized by courts and legal scholars alike. See Henry J. Sommer, *Trying to Make Sense Out of Nonsense; Representing Consumers under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,* 79 Am. Bankr. L.J. 191 (Spring 2005).

11. However, even without the absolute priority rule, the 2005 amendments created new hurdles for confirmation of a plan by an individual debtor. The Debtors cannot obtain a discharge in five years without paying their secured debt over the life of the plan. In Chapter 13 and Chapter 12 certain long term debts can be extended after the discharge has been granted. See 11 U.S.C. § 1322(b)(5); 11 U.S.C. § 1222(b)(9); 11 U.S.C. § 1225. The Chapter 12 and Chapter 13 plan is limited to a maximum of five years. Chapter 11 plans can last as long as 20 years or more, whatever time is needed to pay a reamortized long term secured debt. For corporations, the discharge is granted upon confirmation. See 11 U.S.C. § 1141. The BAPCPA amendments did not limit the length of an individual Chapter 11 plan. In fact, in several places, the amendments recognize specifically the plan may be required to last more than five years. See, e.g., 11 U.S.C. § 1129(a)(15)(B). However, the discharge is granted to an indi-

## IV.

## CONCLUSION

Therefore, for these reasons the proposed plan is not confirmed. The Debtors are granted thirty (30) days to file a modified plan consistent with this opinion. If no such plan is timely filed and no motion to convert to Chapter 7 is filed, the case will be dismissed by subsequent Order of this Court.

IT IS SO ORDERED.

vidual only upon completion of the plan pay-    ments. 11 U.S.C. § 1141(d)(5).